IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION

| | | |
|---|---|---|
| Brogan Adams, | ) | |
| | ) | C.A. No. 6:20-3879-HMH |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **OPINION & ORDER** |
| | ) | |
| United of Omaha Life Insurance Company, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

The matter is before the court for review of the claim administrator's decision to deny long-term disability ("LTD") benefits to Brogan Adams ("Adams") under a LTD benefits policy governed by ERISA.[1]  Adams seeks LTD benefits pursuant to 29 U.S.C. § 1132(a)(1)(B) and attorney's fees and costs pursuant to 29 U.S.C. § 1132(g).  (Compl., generally, ECF No. 1); (Am. Joint Stipulation ("J.S.") ¶ 1, ECF No. 20.)  The parties have filed a joint stipulation and memoranda in support of judgment pursuant to the court's Specialized Case Management Order for ERISA benefits cases.  The parties agree that the court may dispose of this matter consistent with the joint stipulation and memoranda.  (Id. ¶ 8, ECF No. 20.)  For the reasons set forth below, the court reverses United of Omaha Life Insurance Company's ("United") denial of LTD benefits and awards LTD benefits to Adams.

_____

[1] Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001-1461.

## I.  FACTUAL AND PROCEDURAL HISTORY

### A. Adams' Employment and Sick Leave

Adams' claim arises under a group disability policy ("Policy") that was issued by United to Adams' former employer, Hoffman Corporation ("Hoffman").  (Compl. ¶ 4, ECF No. 1.) Adams was employed by Hoffman as a construction superintendent.  (J.S. Exs. (AR 1, 1101), ECF Nos. 19, 19-2.)  According to Adams' job description, his responsibilities included supervising subcontractors and employees, and managing, planning, and overseeing multiple aspects of construction jobs sites.  (Id. Exs. (AR 872-873), ECF No. 19-1.)  Adams' job description listed the essential physical functions as:

- •  Must be able to climb ladders/stairs - 5% of day

- •  Hands/arms - Constant use of hands/fingers for mouse/keyboard/computer use

- •  Sight - Visual acuity in near, mid and far range vision.  Color vision, peripheral vision, depth perception and hand-eye coordination

- •  Hearing - sufficient to hear conversations in person and over the telephone and radio; sufficient to hear alarms on equipment

- •  Speech sufficient to make oneself heard in person, speak in front of groups, and be understood over the telephone and radio

- •  Lift/Carry - up to 50lbs - rarely

- •  Bending/Twisting - minimal

- •  Kneeling/Crouching/Crawling - rarely

(Id. Exs. (AR 350, 872-73), ECF Nos. 19, 19-1.)  Essential mental functions were listed as:

- Constant mental alertness, accuracy, and attention to detail

- Must be able to work independently, make decisions, and follow through on all assignments

- Must use creativity, independent judgment, and organizational and problem-solving skills to determine best method to accomplish desired results

- Must be able to direct, plan, and organize work

- Must possess strong mathematical skills, calculate proper dimensions of components, read/write/speak English, read blueprints, manuals, and communicate with owners, coworkers and craft/union workers

(Id. Exs. (AR 350, 872-73), ECF Nos. 19, 19-1.)  Adams worked for Hoffman from 2011 until April 2019, when he ceased working due to liver problems and mental health issues.  (Id. Exs. (AR 872-873), ECF No. 19-1); (Pl. Mem. 5, ECF No. 21.)

### B. Adams' Diagnosis and Relevant Medical History

On April 5, 2019, Adams' primary care physician, Dr. Phyllis Gilmore ("Dr. Gilmore"), completed a short-term disability benefits form, listing his diagnosis as "abnormal liver functions, vomiting/diarrhea, and anxiety/depression."  (J.S. Exs. (AR 336), ECF No. 19.)  Dr. Gilmore noted that Adams was unable to work and was suffering from an "underlying medical illness, as well as anxiety and depression" that worsened when he attempted to work.  (Id. Exs. (AR 336-337), ECF Nos. 19.)  Dr. Gilmore estimated Adams' future prognosis was excellent. (Id. Exs. (AR 337), ECF No. 19.)

On April 17, 2019, Dr. Gilmore completed another disability form and listed the probable duration of Adams' condition as "uncertain to 3-6 months."  (Id. Exs. (AR 346), ECF

3

No. 19.)  Dr. Gilmore stated Adams had a "concomitant diagnosis of hepatitis causing nausea/vomiting/weight loss/fever; worsening of anxiety."  (Id. Exs. (AR 347), ECF No. 19.)  Dr. Gilmore noted:

> Patient is a high functioning young man with associated issues of anxiety and depression.  During a flare up of this problem, he also developed hepatitis[,] causing multiple physical symptoms as well as abnormal liver tests.  The liver issue has improved, but further testing [is] needed to determine cause[,] which may even have been medication used to treat initial problem.  Psychiatric referral and treatment, metabolic workup are all needed at this point to determine exact diagnosis and treatment plan.

(Id. Exs. (AR 349), ECF No. 19.)

### C. Adams Receives Disability Benefits

On June 5, 2019, United approved Adams' claim for short-term disability benefits.  (J.S. Exs. (AR 65-67), ECF No. 19.)  Adams' short-term benefits commenced on April 19, 2019, and ended on May 30, 2019, the six-week maximum benefit duration permitted under the Policy.  (Id. Exs. (AR 65-67), ECF No. 19.)  On July 15, 2019, United approved LTD benefits under the Policy beginning June 1, 2019.  (Id. Exs. (AR 4857, 6195-6207), ECF Nos. 19-9, 19-12.)

### D. Adams' Medical Care

Dr. Gilmore referred Adams to psychiatrist Dr. James Hancey ("Dr. Hancey").  (Id. Exs. (AR 5729), ECF Nos. 19-11.)  Dr. Hancey routinely saw Adams from May 2019 through February 2020.  (Id. Exs. (AR 1100-1107, 5729-53), ECF Nos. 19-2, 19-11.)  During this time, Dr. Hancey evaluated Adams' psychiatric health, monitored his progress, and managed his medication.  (J.S. Exs. (AR 1100-1107, 5729-53), ECF Nos. 19-2, 19-11.)  Dr. Hancey diagnosed Adams with attention deficit disorder, depression, anxiety, panic disorder, mild cognitive disorder, and memory loss.  (Id. Exs. (AR 5729-53), ECF No. 19-11.)  At the time of

4

Dr. Hancey's most recent records of February 20, 2020, Adams was taking alprazolam, clonazapam, dextroamphetamine-amphetamine, escitalopram oxalate, and terazosin. (Id. Exs. (AR 1105), ECF No. 19-2.) Dr. Hancey completed several disability claim forms and has consistently opined that Adams is disabled. (Id. Exs. (AR 879-81, 2863-65), ECF Nos. 19-1, 19-5.) Regarding Adams' inability to work, Dr. Hancey described Adams' limitations as lacking the ability to manage others, follow directions, organize tasks, or problem solve. (Id. Exs. (AR 880, 2864), ECF Nos. 19-1, 19-5.) Dr. Hancey indicated that Adams' prognosis for recovery is poor, because Adams will never return to his prior level of functioning, and he does not think Adams "can return to work in any responsible fashion." (Id. Exs. (AR 880-81, 2864-65), ECF Nos. 19-1, 19-5.)

Adams was seen by a gastroenterologist, Dr. Jeremy Holden ("Dr. Holden"), to treat his liver issues. (J.S. Exs. (AR 371), ECF Nos. 19.) By June 2019, Adams' liver had returned to normal function with no evidence of chronic liver disease or liver dysfunction. (Id. Exs. (AR 5859-61), ECF Nos. 19-11.)

Adams was also treated by a neurologist, Dr. Tracy Sax ("Dr. Sax"). (Id. Exs. (AR 874-76, 2261-64, 2819-23, 5710-11), ECF Nos. 19-1, 19-4, 19-5, 19-11.) A June 24, 2019 brain MRI was found to be within normal limits. (Id. Exs. (AR 5710-11), ECF Nos. 19-11.) In a disability claim form dated January 24, 2020, Dr. Sax provided a primary diagnosis of mild cognitive impairment with symptoms including memory loss, visuospatial disorganization, and inability to concentrate. (Id. Exs. (AR 874), ECF No. 19-1.) She listed a secondary diagnosis of major depression, anxiety and attention deficit disorder. (J.S. Exs. (AR 874), ECF No. 19-1.) Regarding inability to work, Dr. Sax noted Adams was unable to multitask, concentrate, or

function in a stressful environment.  (Id. Exs. (AR 875), ECF No. 19-1.)  Dr. Sax judged Adams

to be "unable to perform" 12 of 15 specific job situations.  (Id. Exs. (AR 875), ECF No. 19-1.)

 Dr. Sax referred Adams to a neuropsychologist, Lawrence Moore, Ph.D. ("Dr. Moore"),

for a neuropsychological evaluation to provide objective documentation of his cognitive and

psychological status.  (Id. Exs. (AR 1685-94), ECF No. 19-3.)  In January 2020, Dr. Moore

diagnosed Adams with mild neurocognitive disorder, attention-deficit/hyperactivity disorder,

major depressive disorder, unspecified anxiety disorder, and noted features of somatic symptom

disorder.  (Id. Exs. (AR 1694), ECF No. 19-3.)  Dr. Moore offered no opinion as to whether

Adams was disabled, but noted:

> Information available to the current examiner suggests that Mr. Adams may have
> experienced cognitive sequelae secondary to liver dysfunction, although, again, no cause
> for his abnormal labs has been discovered so it remains unclear as to the true nature of
> his medical condition.  Cognitive and psychological symptoms have persisted but
> recently have been improving.  The current evaluation suggests that in addition to
> possible medical factors, there has been a significant influence of psychological factors
> not only on cognitive functioning but on overall functional capacity as related to
> depression and anxiety, and an apparent exacerbation of underlying ADHD
> symptomatology.  In fact, it is difficult to tease apart psychological and physiological
> factors, and psychological factors very well may have contributed to the exacerbation
> and maintenance of cognitive difficulties that initially stemmed from a medical
> condition.  Features of a Somatic Symptom Disorder are evident given this complex
> overlay of psychological and medical factors.  It should be noted that this does not
> suggest feigning of symptoms or that symptoms are not real, but that psychological
> factors have become more intertwined. . . .
>
> Based on current findings, ongoing monitoring of cognitive status is warranted.
> Improvement in cognition is expected with ongoing resolution of medical issues and
> with further psychological treatment.  Testing suggests that depression is currently
> moderate to severe level and anxiety is also moderate to severe.  Mr. Adams would
> benefit from ongoing medication management to assure that distressing psychological
> symptoms are being adequately addressed.  Continued psychotherapy is also warranted
> to not only address acute symptoms of psychological distress but also to help Mr. Adams
> process the impact of what has occurred over the past year and to help him further
> understand the complex mind-body relationship.

(J.S. Exs. (AR 1694), ECF No. 19-3.)

Adams was also seen by Dr. Glen Zielinski, DC ("Dr. Zielinski"), a board-certified functional neurologist. (Id. Exs. (AR 1825-1834), ECF No. 19-3.) Dr. Zielinski noted Adams had a history of concussions from participating in extreme sports and provided a diagnosis of post-concussion syndrome, central origin vertigo, chronic post-traumatic headaches, saccadic eye movement deficiency, other abnormal eye movements, mild cognitive impairment, and major depressive disorder. (Id. Exs. (AR 1825-1834), ECF No. 19-3.)

### E. United Requests an Independent Review

In February 2020, United arranged for an independent review of Adams' claim file from Dr. Yelena Zack ("Dr. Zack"), a board-certified psychiatrist. (Id. Exs. (AR 4868-71), ECF No. 19-9.) Dr. Zack reviewed Adams' medical records through the end of 2019, along with a physician's statement from Dr. Hancey dated January 21, 2020. (Id. Exs. (AR 4868-69), ECF No. 19-9.) Dr. Zack also conducted a peer-to-peer telephone call with Dr. Hancey. (J.S. Exs. (AR 4868), ECF No. 19-9.) Based on her review of the records and discussion with Dr. Hancey, Dr. Zack determined that Adams met the diagnostic criteria for major depression, panic disorder, and memory loss based on mild neurocognitive disorder. (Id. Exs. (AR 4870), ECF No. 19-9.) Dr. Zack was unable to determine the presence of attention deficit disorder without neuropsychiatric testing. (Id. Exs. (AR 4870), ECF No. 19-9.) When asked whether Adams was impaired from a psychiatric perspective beyond December 27, 2019, Dr. Zack reported:

> The documentation provided for the review period does not support clinical evidence of functional limitations from a psychiatric perspective beyond 12/27/19. Treatment notes from Dr. Hancey from 12/27/19 report[ ] improvement in symptoms and the mental status examination is normal without changes in cognition, memory, nor mental status evidence of depression impairing functioning.

Per peer[-]to[-]peer conversation with Dr. Hancey, the reported impairment in functioning documented in the physician statement written by Dr. Hancey on 1/21/20 was [Adams'] self-report and not observed in session.

During the 12/27/19 session, per peer to peer with Dr. Hancey, [Adams] reported feeling better, was less depressed and more hopeful. There was no functional impairment observed in the session. There is no documented difficulty in completing daily tasks. Dr. Hancey's note did not contain findings consistent with his opinion that [Adams] was impaired from his occupational tasks. Based on the information available to me at this time, I do not have evidence that [Adams] was impaired.

(Id. Exs. (AR 4870-71), ECF No. 19-9.)

## F. United Denies Adams' Claim for Continued LTD Benefits

On March 4, 2020, United denied Adams continuing LTD benefits, finding that he no longer satisfied the definition of "Disability and Disabled" under the Policy as of March 10, 2020. (Id. Exs. (AR 4857-64) ECF No. 19-9.) In making its determination, United considered the Policy, Adams' medical records through 2019 and Dr. Hancey's January 21, 2020 physician's statement, Adams' job description, a review by a United medical consultant, and Dr. Zack's independent review. (J.S. Exs. (AR 4859) ECF No. 19-9.) In relevant part, the denial letter stated:

With the medical information we have on file, our review found that you did not have any identifiable restrictions and limitations for memory loss, major depressive disorder, panic disorder, and ADHD. . . .

After review of the available medical records, including progress notes, operative reports, and evaluations, we were unable to substantiate any restrictions and limitations which would preclude you from performing your regular activities, including your regular work activities, beyond December 27, 2019.

In conclusion, you stopped working as a Superintendent on April 02, 2019, due to anxiety and depression, amnesia, and abnormal results of liver function studies. As of December 27, 2019, both your mood and anxiety had improved. You're alert, focused, no deficits in recent/remote memory, and there is no evidence of psychomotor retardation or agitation. The telephone conversation with Dr. James Hancey on February 07, 2020[ ] indicated impairing conditions were all self-reported by you. There

were no findings of functional impairments or any reports documenting your difficulties completing daily task[s].  As such, your medical file fails to substantiate [any] restrictions or limitations which would preclude your ability to perform the Material Duties of your Regular Occupation beyond December 27, 2019.  You no longer satisfy the definition of Disability and Disabled under this policy as of March 10, 2020, your claim for ongoing benefits is denied, and no benefits are payable.

(Id. Exs. (AR 4860-61) ECF No. 19-9.)

### G. Adams' Appeal and Physician Letters

Adams appealed the denial of LTD benefits.  (Id. Exs. (AR 1673-77), ECF No. 19-3.)

Dr. Hancey sent a letter to United dated March 25, 2020 regarding its decision to deny further

LTD benefits.  (Id. Exs. (AR 1100-1107) ECF No. 19-2.)  The relevant portion of the letter read:

My understanding is that, based upon my note of 12/27/2019 which noted some improvement, Mr. Adams was deemed no longer disabled.  That simply is not the reality. First, his cognitive functioning waxes and wanes[,] so he appears better at some times, and more profoundly impaired at others.  Even at his best days he would not be able to return to his previous job duties[,] however.

In my opinion, it would be incredibly unwise to put someone with cognitive impairment (confirmed with a neuropsychiatric evaluation) combined with severe depression, anxiety, ADD and OCD in charge of large groups of people, especially in a dangerous environment like a construction site.  Lives would be at risk.  Because of his visuospatial deficits[,] interpreting blueprints and understanding three[-]dimensional projects would be impaired and thus likely to cause significant errors in his work that again would cause major safety concerns.  [Mr. Adams] also has trouble with organization and concentration that affect[s] his ability to perform tasks such as scheduling, document preparation, and even general computer use.

(Id. Exs. (AR 1100) ECF No. 19-2.)

Additionally, primary care physician Dr. Matthew Breeze ("Dr. Breeze") submitted a

letter to United dated April 23, 2020.  (Id. Exs. (AR 1700-1710) ECF No. 19-3.)  Dr. Breeze

was Adams' primary care physician from 2011 until 2017 and had not seen Adams since 2017

until an office visit on April 14, 2020.  (J.S. Exs. (AR 1700) ECF No. 19-3.)  Dr. Breeze stated

that there had been a "significant decline" in Adams' overall health since he had last seen him in

9

2017, and that Adams was experiencing difficulty with cognitive functioning and impaired

processing.  (Id. Exs. (AR 1700) ECF No. 19-3.)  Dr. Breeze opined that based on his findings,

as well as Adams' neurology and neuropsychology evaluations, he did "not believe [Adams]

could safely or effectively return to his previous work at this time."  (Id. Exs. (AR 1700) ECF

No. 19-3.)

### H. Independent Reviewers Review the Claim File

In order to evaluate Adams' appeal, United retained three independent reviewers to

review the entire claim file.  These peer reviews were performed by Dr. Sarah Sicher ("Dr.

Sicher"), a board certified psychiatrist; Dr. David Hoening ("Dr. Hoening"), a board certified

neurologist; and Dr. David Maroof, Ph.D. ("Dr. Maroof"), a board certified psychologist and

neuropsychologist.

Adams' visits with Drs. Breeze, Zielinski and Moore occurred after the review period

for the initial denial of LTD benefits.  (Id. Exs. (AR 1685-94, 1700-1710, 1825-1834), ECF No.

19-3.)  Additionally, Adams had follow-up visits with Dr. Hancey and Dr. Sax after the review

period for the initial denial of LTD benefits.  (Id. Exs. (AR 1100-1107, 1779-1801, 5727-53),

ECF Nos. 19-2, 19-3, 19-11.)  Updated medical records from each of these visits were provided

to the independent reviewers and were considered by United in the denial of Adams' appeal,

discussed below.  (J.S. Exs. (AR 528-535, 2258-69, 2809-2817, 2819-24), ECF Nos. 19-1, 19-4,

19-5.)

### 1. Peer Review by Dr. Sicher

Based on a review of the claim file using records through March 23, 2020, Dr. Sicher

concluded that "[t]he documentation reviewed does not evidence the presence of a psychiatric

impairment, however the documentation does support the presence of mild cognitive impairment of an unknown cause." (Id. Exs. (AR 2809-2817), ECF No. 19-5.) Dr. Sicher found that Adams' "mild cognitive impairment does not impact his daily functioning." (Id. Exs. (AR 2814-15), ECF No. 19-5.) Regarding restrictions and limitations as of March 10, 2020 through August 1, 2020, Dr. Sicher reported "the documentation does not support the presence of a psychiatric impairment that precludes occupational functioning." (Id. Exs. (AR 2815), ECF No. 19-5.) Dr. Sicher summarized, "[w]ithout objective evidence supporting psychiatric impairment that precludes working, no psychiatric restrictions and limitations can be recommended at this time." (Id. Exs. (AR 2816), ECF No. 19-5.)

### 2. Peer Review by Dr. Hoening

Dr. Hoening also issued a detailed report after reviewing the claim file, which included records through May 2020. (J.S. Exs. (AR 2819-24), ECF No. 19-5.) Dr. Hoening determined that, "from a neurological perspective only, there is no clear neurological diagnosis supported by the clinical information." (Id. Exs. (AR 2822), ECF No. 19-5.) Regarding restrictions and limitations as of March 10, 2020 through August 1, 2020, Dr. Hoening reported:

> Based on the documentation provided, and from a neurological perspective only, [Adams] does not have any specific restrictions and limitations as of March 10, 2020, through August 1, 2020.
>
> It is acknowledged that [Adams] complains of cognitive difficulty. [Adams] was under the care of neurology. There were no clear physical deficits on the exam. MRI of the brain was negative. [Adams] had neuropsychological testing that showed possible medical factors, there has been a significant influence in psychological factors on cognitive functioning, and somatic symptom disorder is evident.
>
> However, there is no clear documentation of clinical cognitive pathology based on a primary neurological etiology. The neurologist has deferred care to a chiropractor and is to see [Adams] for follow-up in six months. As such, there are no clear neurologically-based restrictions and limitations. It is advised for a neuropsychological

reviewer to comment on any specific cognitive restrictions and limitations[,] as a
neuropsychologist will be able to review the validity and accuracy of the
neuropsychological evaluation.

(Id. Exs. (AR 2822-23), ECF No. 19-5.)

### 3. Peer Review by Dr. Maroof

Dr. Maroof reviewed the record, including the independent reviews by Drs. Sicher and

Hoening.  (Id.  Exs. (AR 2258-69), ECF No. 19-4.)  Additionally, Dr. Maroof engaged in a

peer-to-peer telephone call with Dr. Moore.  (Id. Exs. (AR 2265-66), ECF No. 19-4.)  From

their conversation, Dr. Maroof reported, in relevant part:

> I asked Dr. Moore to reconcile the apparent discrepancy between the largely normal
> cognitive test scores and Mr. Adams' reported functional difficulties. [Dr. Moore] told
> me that [Mr. Adams'] difficulties were psychological rather than cognitive, and opined
> that Mr. Adams thought that he was more cognitively impaired than he actually was.  Dr.
> Moore said that [Mr. Adams] maybe had some mild cognitive issues, but nothing
> significant.  I asked this provider as to why a measure such as the MMPI or PAI – as
> opposed to more cursory tests of psychological functioning – was not administered given
> all of his concerns about the [Mr. Adams'] psychological symptoms.  Dr. Moore replied
> that if he had more time to evaluate Mr. Adams and / or if the referral question had been
> different (as the referral was based on [Mr. Adams'] cognitive symptoms), he would
> have incorporated such a measure.

(J.S. Exs. (AR 2266), ECF No. 19-4.)  Dr. Maroof further indicated:

> [Dr. Moore] opined that Mr. Adams' psychological difficulties were the basis for his
> problems.  However, this provider also admitted that he did not administer any robust
> measures of mental illness (e.g., PAI or MMPI) that included symptom validity
> assessment.  He agreed with my concerns that a lack of such data makes it difficult to
> opine on the veracity of [Mr. Adams'] reported psychological symptoms.

(Id. Exs. (AR 2266), ECF No. 19-4.)

Dr. Maroof found Adams' diagnoses of depression and anxiety to be supported by the

available information.  (Id. Exs. (AR 2267), ECF No. 19-4.)  However, Dr. Maroof concluded

"the data do not support that Mr. Adams' neuropsychological symptoms have impacted his daily

functioning." (Id. Exs. (AR 2266), ECF No. 19-4.)  Dr. Maroof explained:

> [T]he data available for review, including the normal cognitive test performances with
> Dr. Moore, the lack of any robust psychological assessment or validity testing, largely
> normal mental status examinations, and separate opinions from psychiatry and
> neurology regarding [Mr. Adams'] functioning, all do not provide support that Mr.
> Adams' functioning is compromised.

(Id. Exs. (AR 2267), ECF No. 19-4.)  Regarding restrictions and limitations as of March 10,

2020 through August 1, 2020, Dr. Maroof concluded "[n]o restrictions or limitations are

supported by the available data" and that "the limitations proffered by some of his treating

providers about [Mr. Adams'] not being able to work are not supported."  (J.S. Exs. (AR 2268),

ECF No. 19-4.)

### I. United Denies Adams' Appeal

On October 26, 2020, United denied Adams' appeal and upheld its decision to terminate

Adams' LTD benefits  (Id. Exs. (AR 528-535) ECF No. 19-1.)  United explained:

> We acknowledge Mr. Adams was assessed with depression and anxiety, and he reported
> cognitive impairment.  While we appreciate his treating providers' opinions, the clinical
> evidence does not support he was unable to perform his regular occupation. From a
> psychological perspective, the records do not support the presence of psychiatric
> impairment or cognitive deficits.  The records provide no evidence to support he was
> unable to perform his daily activities or that his conditions affected his cognition or
> ability to interact with others or communicate or act in his own interest.  Physical
> examination findings document no clear physical deficits on the examination, and the
> MRI of the brain was negative.  The physical examinations have noted unremarkable
> findings with preserved function without focal neurological deficit or compromise in
> muscle strength.  There is no clear documentation of a clinical cognitive pathology
> based on a primarily neurological etiology or that he has compromised functioning due
> to any neuropsychological impairment.  There was no evidence of ongoing liver
> dysfunction to support impairment beyond March 10, 2020, as his liver function test
> results normalized.  We have received no gastroenterology records dated beyond August
> 20, 2019.  As of his follow up visit to Dr. Holden on August 20, 2019, Dr. Holden noted
> no evidence of chronic liver disease or liver dysfunction. It was recommended he have

13

liver chemistries done twice a year by his primary physician. No follow up was indicated, and he was to return as needed.

In summary, the file lacks confirmation of physical examinations, diagnostic testing, and medical documentation to substantiate Mr. Adams would be unable to perform the material duties of his regular occupation beyond the date benefits were considered. Therefore, disability is not supported. No additional benefits are payable, and the denial of Brogan Adams'[] claim has been upheld.

(Id. Exs. (AR 532) ECF No. 19-1.)

### J. Relevant Plan Terms

It is undisputed that the Policy grants United "the discretion and the final authority to construe and interpret the Policy." (Am. J.S. ¶ 6, ECF No. 20); (J.S. Exs. (AR 512) ECF No. 19-1.) "This means that [United has] the authority to decide all questions of eligibility and all questions regarding the amount and payment of any Policy benefits within the terms of the Policy as interpreted by [United]." (Am. J.S. ¶ 6, ECF No. 20); (J.S. Exs. (AR 512) ECF No. 19-1.)

Only an employee who is "disabled" may receive benefits payments under the Policy. The relevant Policy language is as follows:

**Disability and Disabled** mean that because of an Injury or Sickness, a significant change in Your mental or physical functional capacity has occurred in which:

(a) during the Elimination period, You are prevented from performing at least one of the Material Duties of Your Regular Occupation on a part-time or full-time basis; and

(b) after the Elimination period, You are:

(1) prevented from performing at least one of the Material Duties of Your Regular Occupation on a part-time or full-time basis; and

(2) unable to generate Current Earnings which exceed 99% of Your Basic Monthly Earnings due to that same Injury or Sickness.

After a Monthly Benefit has been paid for 2 years, **Disability** and **Disabled** mean You are unable to perform all of the Material Duties of any Gainful Occupation.[2]

Disability is determined relative to Your ability or inability to work. It is not determined by the availability of a suitable position with the Policyholder.

**Material Duties** means the essential tasks, functions, and operations relating to an occupation that cannot be reasonably omitted or modified. In no event will We consider working an average of more than the required Full-Time hours per week in itself to be a part of material duties. One of the material duties of Your Regular Occupation is the ability to work for an employer on a full-time basis.

**Regular Occupation** means the occupation You are routinely performing when Your Disability begins. Your regular occupation is not limited to Your specific position held with the Policyholder, but will instead be considered to be a similar position or activity based on job descriptions included in the most current edition of the U.S. Department of Labor Dictionary of Occupational Titles (DOT). We have the right to substitute or replace the DOT with another service or other information that We determine to be of comparable purpose, with or without notice. To determine Your regular occupation, We will look at Your occupation as it is normally performed in the national economy, instead of how work tasks are performed for a specific employer, at a specific location, or in a specific area or region.

Disability and other benefits will be paid after We receive acceptable proof of loss. Benefits will be paid only if We determine that the claimant is entitled to benefits under the terms of the Policy. We may require supporting information which may include, but is not limited to, the following:
>    a) clinical records;
>    b) charts;
>    c) x-rays;
>    d) Proof of Earnings; and
>    e) other diagnostic aids.

(J.S. Exs. (AR 512, 516-18), ECF No. 19-1.)

---

[2] The Policy provides that if the disability is a result of a "mental disorder," benefits are limited to a total of 24 months per occurrence, unless the employee is confined as a resident inpatient in a hospital at the end of the 24-month period. (J.S. Exs. (AR 508), ECF No. 19-1.) This limitation is not at issue in the instant case because Adams has not received LTD benefits for a period of 24 months.

Adams received LTD benefits from June 1, 2019, to March 20, 2020.  (Id. Exs. (AR 4857-64, 6195-6207), ECF Nos. 19-9, 19-12.)  Because that time period does not exceed 24 months, the relevant inquiry regarding his "material duties" is whether Adams is "prevented from performing at least one of the Material Duties of [his] Regular Occupation on a part-time or full-time basis[.]"  (Id. Exs. (AR 516-18), ECF No. 19-1.)

### K. Procedural History

United's denial of Adams' LTD benefits became final when United denied his appeal on October 26, 2020.  (Id. Exs. (AR 528-35), ECF No. 19-1.)  Adams filed the instant action on November 6, 2020.  (Compl., ECF No. 1.)  On June 1, 2021, the parties filed a joint stipulation.  (J.S., ECF Nos. 18, 19.)  On June 8, 2021, the parties filed an amended joint stipulation.  (Am. J.S., ECF No. 20.)  The parties filed memoranda in support of judgment on June 18, 2021.  (Pl. Mem. Supp. J., ECF No. 21; Def. Mem. Supp. J., ECF No. 22.)  On June 25, 2021, the parties replied to the memoranda.  (Pl. Reply, ECF No. 24; Def. Reply, ECF No. 25.)  This matter is now ripe for consideration.

## II.    DISCUSSION OF THE LAW

### A.    Standard of Review

As an initial matter, the parties disagree about the appropriate standard of review that applies in evaluating United's decision to deny LTD benefits.  "[A] denial of benefits challenged under [ERISA] is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan."  Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989).  United argues that an abuse of discretion standard applies because the Policy contains

16

discretionary language.  (Def. Mem. Supp. J., generally, ECF No. 22); (Def. Reply 1-2, ECF

No. 25.)  Adams argues that despite the language in the Policy a *de novo* standard applies

because the Policy is governed by Oregon law and an Oregon insurance regulation, Or. Admin.

R. 836-010-0026, has banned discretionary clauses.  (Pl. Mem. Supp. J. 2-3, 20, ECF No. 37);

(Pl. Reply, generally, ECF No. 40.)

      In 2015, Oregon adopted a regulation prohibiting any new or renewal policies, contracts

or agreements from containing a discretionary clause that grants deference to the insurer in

court proceedings.  See Or. Admin. R. 836-010-0026 ("A policy, contract or agreement offered

or issued in this state . . .  may not contain a discretionary clause or other language purporting to

reserve discretion to the insurer to interpret the terms of the contract . . . .").  Research revealed

no relevant case law addressing Oregon's specific regulation.  However, several circuits,

including the Ninth, Seventh, and Sixth Circuit Courts of Appeals, have held that similar state

bans on discretionary language in ERISA plans are not preempted.  See Standard Ins. Co. v.

Morrison, 584 F.3d 837, 846-47 (9th Cir. 2009) ("Because the practice merely forces ERISA

suits to proceed with their default standard of review, it cannot be said to 'duplicate,'

'supplement,' or 'supplant' the ERISA remedy.  Since it adds nothing the ERISA scheme does

not already contemplate, the practice is distinguishable from cases in which a state attempts to

meld a new remedy to the ERISA framework." (internal citations omitted)); see also Fontaine v.

Metro. Life Ins. Co., 800 F.3d 883, 889 (7th Cir. 2015); Am. Counsel of Life Insurers v. Ross,

558 F.3d 600, 609 (6th Cir. 2009).  United points to no case law finding that these state laws

and regulations prohibiting discretionary clauses are preempted by ERISA.

With certain exceptions, ERISA preempts state laws that "relate to any employee benefit plan." 29 U.S.C. § 1144(a). Relevant here, the "savings clause" saves from preemption state laws "which regulate[] insurance." Id. § 1144(b)(2)(A). It is undisputed that Oregon's regulation "relate[s] to any employee benefit plan." 29 U.S.C. § 1144(a). Therefore, it is preempted unless preserved by the savings clause. Id. § 1144(b)(2)(A); see also Morrison, 584 F.3d 837, 841-42. For a state law to be deemed a law "which regulate[s] insurance" it must satisfy two requirements. Kentucky Ass'n of Health Plans, Inc. v. Miller, 538 U.S. 329, 341-42 (2003). "First, the state law must be specifically directed toward entities engaged in insurance. . . . Second, . . . the state law must substantially affect the risk pooling arrangement between the insurer and the insured." Id. at 342 (citations omitted).

After review of Oregon's regulation and the relevant case law, the court agrees with the analysis of this issue in Morrison and finds that Oregon's insurance regulation prohibiting discretionary language in ERISA plans is saved from preemption under 29 U.S.C. § 1144(a) by the savings clause in section 1144(b). See Morrison, 584 F.3d 837, 842-45. Turning to the instant action, the Policy was revised on January 1, 2019. (J.S. Exs. (AR 1, 1101), ECF Nos. 19, 19-2.) Therefore, Oregon's regulation is applicable to the Policy, and United's denial of benefits will be reviewed *de novo*. See Or. Admin. R. 836-010-0026(4).

## B.    Denial of LTD Benefits

In conducting a *de novo* review, the court should look only at the evidence that was before the Policy administrator or trustee at the time of the determination. See Quisenberry v. Life Ins. Co. of North America, 987 F.2d 1017, 1025 (4th Cir. 1993). The question before the court is whether Adams is "disabled" within the meaning of the Policy as of March 10, 2020,

the date United discontinued Adams' LTD benefits.  In reaching this decision the court will

consider the administrative record and the briefs submitted by the parties.  Under the Policy,

Adams is "disabled" if:

> because of an Injury or Sickness, a significant change in [Adams'] mental or physical
> functional capacity has occurred in which [Adams is]:
>
>> (1) prevented from performing at least one of the Material Duties of [his]
>> Regular Occupation on a part-time or full-time basis; and
>
>> (2) unable to generate Current Earnings which exceed 99% of [his] Basic
>> Monthly Earnings due to that same Injury or Sickness.

(J.S. Exs. (AR 516), ECF No. 19-1.)

It is undisputed from the record that Adams suffers from various mental health

conditions including attention deficit disorder, depression, anxiety, panic disorder, and mild

cognitive disorder.  These diagnoses were confirmed by Dr. Moore as well as United's

independent reviewers.  The record shows that Adams was under continuous mental health

treatment with Dr. Hancey throughout the time he received disability benefits.  Dr. Hancey

made ongoing changes to Adams' treatment and medication.  As of February 20, 2020, Adams

was taking five medications to treat his mental health conditions.

Although the diagnoses are undisputed, the record contains conflicting evidence

regarding functional limitations from Adams' mental health conditions.  From a psychiatric and

psychological perceptive, Dr. Hancey maintains that Adams is disabled, but Drs. Zack, Sicher,

and Maroof reject any findings of functional restrictions and limitations.  United's reviewers

found there were no objective findings regarding Adams' symptoms and noted that some

functional limitations were self-reported by Adams.  For example, Dr. Zack noted that Dr.

Hancey's January 21, 2020 physician's statement supporting functional impairment was based

19

on Adams' self-report. (J.S. Exs. (AR 4870-71), ECF No. 19-9.) Additionally, Dr. Sicher

opined that Adams had no psychiatric restrictions or limitations because there was no objective

evidence supporting psychiatric impairment. (Id. Exs. (AR 2815-16), ECF No. 19-5.) Further,

Dr. Maroof noted that the lack of symptom validity testing performed by Dr. Moore rendered "it

difficult to opine on the veracity of [Adams'] reported psychological symptoms." (Id. Exs. (AR

2266), ECF No. 19-4.)

    The reviewers' focus on the lack of objective evidence is inconsistent with the Policy,

which does not require proof by objective medical evidence. The Policy states LTD benefits

"will be paid after [United] receive[s] acceptable proof of loss." (J.S. Exs. (AR 511-12), ECF

Nos. 19-1.) The Policy does not define what constitutes acceptable proof, stating only that

United "may require supporting information which may include, but is not limited to" clinical

records, charts, x-rays, proof of earnings, and other diagnostic aids. (Id. Exs. (AR 511-12), ECF

Nos. 19-1.) Further, while the Policy limits LTD benefits for "mental disorders" to a total of 24

months, with exceptions, it does not require objective evidence to prove disability.

    Because the Policy contains no provision precluding Adams from relying on his

subjective complaints as part of his disability, the court has considered self-reported symptoms

along with the record as a whole. See DuPerry v. Life Ins. Co. of N. Am., 632 F.3d 860, 873

(4th Cir. 2011) (citation omitted); see also Conway v. Reliance Standard Life Ins. Co., 34 F.

Supp. 3d 727, 734 (E.D. Mich. 2014) ("Where a plan does not explicitly limit proof to objective

medical evidence, courts have also considered subjective evidence, including the insured's

self-reported evidence.") (internal citations omitted)). Further, "[e]valuation of mental health

necessarily involves 'subjective symptoms,' which are most accurately ascertained through

'interviewing the patient and spending time with the patient,' such that a purely record review will often be inadequate where a disability claim includes a mental component." <u>Okuno v. Reliance Standard Life Ins. Co.</u>, 836 F.3d 600, 610 (6th Cir. 2016) (internal citations omitted). Adams' diagnoses are undisputed, and he has been under the continued care of Dr. Hancey for mental health treatment.  Adams' reported symptoms and limitations were corroborated by Dr. Hancey, who had the opportunity to observe and assess the veracity and severity of his mental health conditions.  Dr. Hancey's treatment has included monitoring changes in Adams' symptoms and making multiple changes in medication type and dosage.

After extensive review of the administrative record and the parties' briefs, the court finds that Adams has proven he is "disabled" as set out in the Policy.  As of March 10, 2020, Adams was unable to perform at least one of the material duties of his occupation as a construction supervisor.  Adams is unable to work full-time because of his inability to perform certain essential tasks, functions, and operations relating to his occupation that cannot be reasonably omitted or modified.  Specifically, the court finds Adams cannot perform the essential mental functions required of his job, which include the ability to work independently and make decisions; using creativity, independent judgment, and problem solving; the ability to direct, plan, and organize work; possessing strong mathematical skills to calculate proper dimension of components; and reading blueprints and manuals.  (J.S. Exs. (AR 350, 872-73), ECF Nos. 19, 19-1.)

For the reasons set forth above, the court concludes from the evidence in the record that Adams has proven he is "disabled" as set out in the Policy.

It is therefore

**ORDERED** that United's decision denying Adams LTD benefits is REVERSED.  It is further

**ORDERED** that the Policy pay LTD benefits to Adams.

**IT IS SO ORDERED**.

s/Henry M. Herlong, Jr.
Senior United States District Judge

Greenville, South Carolina
July 27, 2021